We turn to the next case this morning, which is United States v. Lozano. 18-1031. May it please the Court? Good morning. My name is Anna DeViti, and I represent Lucio Ivan Lozano. I was also the attorney in the lower court. I will be reserving three minutes for rebuttal. Mr. Lozano took a plea in this case, and that is important because the facts that the Court could rely on to determine if the enhancement of 2D1.1B12 applied were exclusively included in the statement of facts and, again, in the PSI. The PSI facts resembled identical the facts in the statement of facts in the plea. So, therefore, what the Court erroneously did was he gave Mr. Lozano a two-point bump-up to a sentence of 15 years for use of a premises in the distribution or manufacturing of a drug. He got a two-level. He did, sir, exactly. And at the level of the— Some of that 15 years he earned. Yes, sir. Yes, sir. And for purposes of this hearing, I'm going to rely on my argument on the second issue on whether or not he was a manager or not. I'm going to rely on what I've already argued. But I'm concerned here with the first issue on my brief, which specifically included the two-point enhancement. At Mr. Lozano's level, because of the level he was at, it did increase his sentence in excess of two and a half years. And I think what the Court did in this case, and I'm sure the Court is— he implied and imputed certain facts that were not specifically included. He, on several occasions, included facts such as he rented this house. Well, he was paying $2,000 a month for a house he didn't live in that all of his compatriots were driving into and picking up and dropping off drugs, paid the utilities, and what other purpose could possibly it be used for? Well, just let me break that up into little pieces. Number one, Mr. Lozano did live in the house. One brief period of time. Yes, sir. This house was originally rented in July of 2014. It is clear from the PSI and the evidence that was developed that Mr. Lozano traveled. He's a U.S. citizen. He traveled within Denver, where he was born, and Mexico. He had a rooster-fighting business in Mexico, and normally he left during the months of November through sometime in, I think it's April. What happens is Mr. Lozano does rent this house for him and his family, evidenced by the fact that when the—because what is important about this case, and I think this is a very important fact, is that they're constantly surveilling this house. They have a pole camera. They have detectives driving by this house on a regular basis. And what are they able to determine throughout this 18-month period that Mr. Lozano leases this house? That there are two, only two specific transactions where drugs were brought into the home and quickly turned around and money was taken out. Our position is that it's no way that the court can find that this was the primary purpose of the home. It is true that on those two occasions, it was used for that purpose. But what is especially interesting is that the third transaction in the statement of facts specifically states another address in Denver where the Neufelds took their load. So therefore, it wasn't that this home was the only place that was used for primarily this purpose. What's your best case that says if you only use it several times, it's not for the purpose of drug use? Well, Judge, I think and—well, this specific circuit came up with a decision recently that I'm quite sure the court is well aware of, which is the Murphy decision. And while that decided against our premise, it expanded it to say that the court has to consider several different factors. If you consider those factors in relation to Mr. Lozano and this home, it's important to note that there was two cooperating people, actually there was three because it was a couple, who told the government everything they knew about this case. Those individuals were only specifically able to pinpoint two specific times they went to this home. So what the court did was the court said, I believe, and it's interesting, what his final decision was, he said on page 87, he said, the evidence that I have suggests that this house is about using it to facilitate this drug distribution network that he is a part of. Well, I don't think that this enhancement is because it facilitated the drug distribution network. What it did was on two occasions allowed it to use this house for a limited purpose of moving in and out. The fact that the quote-unquote co-conspirators who are his family members live in this house does not add to this enhancement in any way. On the contrary, when the police, who was vividly watching this house, saw that they were leaving the home, that Mr. Lozano was back in the home, they followed him to a storage. When they went to that storage, they didn't find drug paraphernalia, they didn't find ledgers. What they found was kids' clothes, furniture of the house, a washer and dryer, and Mr. Lozano's car, against evidence by the fact that this house was a home. This was a home. Well, you can have a home and have drugs in it. I agree with you, Your Honor, but you're also... What's the big deal about that? It's a home. I agree with you. The house is not a home necessarily. Well, no, no, no. And I agree with you, Your Honor, that it's definitely a home. But I would say that the two transactions that occurred over this 18-month period were incidental to the use of the house. The judge... Well, what are the transactions? They have names, don't they? Yes, they do. The multi-transaction... Okay. Now, in that transaction, the garage opened, the cars pulled in, the doors closed, co-conspirators were living there. The vehicle was found to have $265,000 in it in two false compartments. Now, there was the Newfield load. Right. There were two Newfield loads. Right. The first one went to our home. That went into the garage. Yes. Doors closed, came out, stopped later on, found money, et cetera. No. Actually, what happened was, Judge, that car was never stopped. Subsequent to that, they put a GPS on the Newfield's car, and they found that they came back to Denver again from the hub of the conspiracy which started in El Paso. And they found $100,000 in it. Excuse me? They found $100,000 in it. Right. But that one came from another house in Colorado that belonged to one of the other co-defendants, Lara Gallegos. The government is very clear during our sentencing hearing that only two transactions happened at this home. So, therefore, and... Well, he wasn't living there at the time. During those two transactions, he was not. But he was paying the rent. He was paying the utilities. Well, Judge, that's another inference. Yes, the lease is in his name. Yes, he leased the home. But there's absolutely no evidence that he paid it on a monthly basis. On the contrary, the facts are clear that they were paid by money order to the landlord of the property. Mr. Lozano was clearly not here. So it's also fair to infer that the gentleman that was living in the home paid the rent. But I have a question. Yes, ma'am. He rented this house for 18 months. Yes. How much of that time did he live there? All the time except for the six months that he was in? Yes. Yes. Yes, Judge. He did. He lived there at the beginning. He lived there from the time he rented it. From July to November. Yes, ma'am. And then he was out from November to about April. Then he moved back in in April again. And he lived there until November until all of the properties, which the agents were able to see, were moved to a separate warehouse. And his living, his furniture, his washing machine, everything was in that house. So there's some recollection that when he was asked about his homes, he didn't mention this place. Is that true? I believe, Judge, that at some point when they asked him when he was arrested, when he's coming back into the country through New Mexico, they asked him where he lives, and this house was not the house he was living in because by that point, he already had moved out, evidenced by the fact that they found on him the end-of-the-leaf contrast with the repairs they had to do to the house, and also evidenced by the fact that they had the utilities. So definitely at the time he is arrested, months later, he no longer lives in that home. What the government has tried to do is they've tried to infer that because the co-defendant that lived in the house, Lara Gallego's home, his new home, six months later is subsequently searched, and in this home they find drug paraphernalia, they find money, they find numerous items. This means that these drugs, these tools of the trade are somehow in my client's house six months before. But again, that's speculation on their part. They have no evidence of that. It's much more if we look at, and what makes this case egregious is I think the judge and the government take a lot of – they imply, they constantly say, well, this is a very big organization which moves somewhere between 50 to 150 kilos. Therefore, the judge says, I believe that they're – yes, sir? Oh, no, that's all right. I was just wanting to know that I've got a question whenever you – Oh, okay, just briefly. The litany. I'm sorry? Whenever you finish your litany. I'll talk really quick. When you take a breath, let Judge – I'll take a breath. Okay, you've taken a breath. Why don't I ask my question? Yes, sir, absolutely. We're supposed to give great deference to the district court's application of the guidelines, to the facts, right? Yes, sir. Now, given that you acknowledge that there was some drug dealing and some use of the garage for transportation of the drugs. Yes, sir. At what point do you want us to kind of draw this arbitrary line and say, giving great deference to the district court, using some kind of a sliding scale, because there was only several instances of drug connection to this house, we're not going to find that the district court is entitled to apply the guidelines? It seems to me you're asking us to apply some kind of a scale to the facts to determine the violation of the court's deference. And I'd like your thinking on that. Well, Judge, it's not so much as a scale, but as this court has specifically said in their recent decision, a totality of the circumstances. All right. Well, this is – fine. I mean, lots of lingo, but still the same thing. There was some use. Absolutely, Judge. And all of the cases that have applied this enhancement that have been affirmed deal with constant drug use under a much limited purpose, under a much shorter amount of time where they're constantly moving drugs, where the house is inevitably searched and tools of the traitor found. But in Murphy, weren't there only two instances? No, ma'am. The court relies on two, but if we read the facts carefully, there's four separate search warrants that are executed on that house. What happens is Mr. Murphy is arrested by the state court, released, goes back to the house, they do another warrant, again he gets out again, they have information from a CI that finds her being taken – taking place at the house, they go back. So there's actually a total of four different times. In addition to that, in Mr. Murphy's house, it was clear that there were all sorts of tools, there were baggies, there were drugs, there were several other items that are not found in my client's house. If the – if they had not been watching the house for such a long period of time, this argument may be a little stronger for the government, but they're watching on a day-to-day basis. They don't see – Did you assert these things before Judge Moore? I did. I asserted most – yes, I did, Judge. And he – And I'm sure you used the same degree of passion, which is impressive. I did. It's the Miami compassion, yes. You can still have this level of passion after you've been living with this case as long as you have. But – Yes, sir. Why did he reject your argument? I think he rejected it because he said – and I need – the court needs to be aware that he had heard an entire trial having to do with another lead co-defendant prior to my client's sentencing. He had also sentenced two other underlings of the same case prior to us going before him. I think that while he tried not to, I think there were definite facts and ideas that commingled into the facts that were presented in this case. He kept saying this is a large-scale conspiracy. There's 50 to 150 kilos. And I agree with that. But Lucero, who is the main guy, who is the co-operative – He's the bad dude. What? Lucero's the bad dude. Well, he has a bad name. He specifically gets arrested a month after my client rents the house. So all of the drugs – All right. We're going to give you – Yes, sir. Reserve the rest of your time or you're not going to have any. Thank you, sir. All right. Counsel, we'll hear from you this morning. Good morning, and may it please the Court. I'm Marissa Miller, and I represent the United States in this matter. I'm going to – Counsel, our former colleague, Judge Henry, always used to ask at some point every time he sat, under what scenario do you lose? Looking at this case, under what scenario do you lose? It's very difficult for me – It's pretty difficult to find a scenario. There's only one or two uses, right? So if you – What? If there's only one, then you lose? Or if there's none, of course – In the hypothetical scheme, when does this – If you can't prove any, then of course you lose. But if you prove – if they prove one, is that enough? I think that maybe if you had someone who has lived in their house for 10 years and does one occasional drug deal and happens to do it out of their house, then the guidelines certainly wouldn't apply in that case. All right. And so in this case, he lives in the house for 18 months. He goes off to his summer – his warm weather winter occupation in Mexico. And then he comes back. Assuming this is his routine and they do find drugs once, is that enough for you to win? Well, I think there's a lot of evidence beyond just the two incidents. I guess I want to start by talking about how it's a little bit – Well, that's a different matter. I mean, you mean there's – this is Murphy. There are a lot of others under a totality review. Yeah, I mean, I think Murphy and Henderson are very relevant here. I think if you compare – Well, of course they're relevant. That's not my question. I said, is there a lot of other evidence here of ancillary use? Yes. Well, and let me talk about it. First of all, I guess I want to say that when we're saying two incidents, in some sense that's a little bit misleading, right? Because when we talk about incidents in Murphy and in Henderson, we're talking about these very brief 30-minute drug transactions. Where in this case, yes, we're saying two incidents, but this is an eight-day-long situation where the house is involved. This isn't just some guy coming up to the house and buying, you know, a user quantity of cocaine. The car is parked in the garage. It brings eight kilos to the house, stays there for eight days while the guys unpack it, and then they collect some cash, and then they hide almost $300,000 in cash in the car. I think that in nature is very different than saying- So it's a big transaction. Yes. So not a little. So is the fact that even though there's only one, the fact that it's a big transaction, is that enough to get you through the guidelines? So I think there's a difference between saying it's big in terms of the quantity of drugs, which Murphy tells us is extremely important, but also in terms of the length, right? I mean, by saying, you know, someone used their house two times just for a 20-minute drug deal versus this guy was parked in the garage for a week, I don't think when you're talking about the frequency with which the property is used, that's fair. I mean, I don't know how we calculate frequency, but let's say we do it purely in terms of time. I mean, in Murphy, there were two sales that we knew of. So, okay, an hour of the house's time has been used for this use. Here we have a week. I mean, are those analogous? I wouldn't think so. And then also, as you pointed out, Murphy makes it very clear that the quantity of drugs involved is an extremely important consideration here. And Murphy... So if there's... Let me synthesize what you've said. If there's only one use, but it is a protracted transaction of eight days, that is enough to satisfy the guideline? I think maybe... You know, I would say yes, and then I think especially in a situation like this, where we have obviously more transactions and... Well, you have one other transaction. We have one other transaction. Is there more than these two? Because if there are, then we need to know that, of course. Well, so, I mean, this is a weird situation because we're limited, obviously, to this very... It's weird because you're limited to the record. So what does the record tell us? Well, okay, so we're limited to the stipulated facts. And I think one really important consideration is the fact that we have a direct admission in the stipulated facts that the defendant agreed to with Mr. Molina Villalobos saying, yes, we used the house at Josephine Street to take bricks out of cars that we received from various people. And, you know, as the district court noted, it says various, not just once or twice. You know, this is his confession, and the defendant is agreeing to that. And we're on a preponderance of the evidence standard. I think if you have in the stipulated facts someone saying, we're using a house for this purpose, if that doesn't get you across the line, it certainly gets you close. Then we have, again, these two very specific examples. And, you know, were there... So you were judging more with... He went with the various people aspect of the one transaction. I mean, I guess that's true. There were two new felts in the car. So perhaps, you know, various people refers to more passengers in the car. But I think when you say, we took bricks out of the car from various people, that doesn't mean, hey, this one time I took a brick, you know, of cocaine out of the car. I think that means, yeah, that was the pattern. That's what we were using the house for. Well, the white Toyota that they put the GPS on had been in the garage, and then it was out traveling around. Yes. And the Mississippi police stopped it and found $100,000 in it. Yes, and when they spoke to the new felts, the new felts told them that their first load had been eight kilos of cocaine, and that's the load that they brought to the Josephine Street house. And their second load was 10 kilos. I mean, it's difficult, right, because we are limited to these stipulated facts. But I think that's an important thing to remember, because these are just two examples, and they're the times when we have irrefutable evidence that that's what the house is being used for. I mean, there may have been other times where, you know, the house wasn't under surveillance for several months. And then these were the two specific times that, you know, they were so sure that those were load cars that they decided to stop them and got probable cause to search them, and in both of those cases just got direct confessions from the drivers that that was what they were doing. So if you were writing the case note about our decision in this case, and if you won, how would the case note read? Tenth Circuit holds that. The Tenth Circuit holds. Go ahead. Fill in the blank. Okay. That this enhancement would apply, you know, because the government established by a preponderance of the evidence. And here's the evidence. Direct admission for Mr. Molina Villalobos. The two specific examples of transactions that were. The Tenth Circuit held that in a case involving two transactions, one, two, two transactions over an 18-month period. Over an 18-month period. I'm not sure it's fair. Over? I will say I'm not sure. Not over. During. During an 18-month period. Two transactions during a period during which a defendant had a house leased for 18 months. Continue with the case note, please. Okay. The Tenth Circuit held that two transactions that were lengthy in nature and were immense in quantity, eight kilos of. Two transactions that were. Multiple days. Multiple days. How's that? Multiple days. Eight days to be specific. And then I would also say in addition. And involving large quantities of drugs and wine. Large quantities of cocaine. I would say. I would add three more points to the case note. Okay. I would say other evidence was the fact that there's this very suspicious arrangement where we don't know. There's no lawful reason for the defendant to just have this house. He rents this house and he's paying $2,000 a month in rent and utilities. And what's happening while he's gone is he's letting his co-conspirator live in the basement and the co-conspirator during that time is handling these loads. And we know also from the record that, you know, this isn't just his uncle. This is his underling. And that this is kind of the guy who's in charge. Thank you. End of quote on the case note. And I would also add in the Tenth Circuit held that it was bound by its previous decision in Murphy. And note that in this case the evidence was more substantial in both Murphy and its unpublished decision in Henderson. And I do want to just sort of talk about this. What did you say? It was more than Murphy and Henderson? It was bound. Bound. Bound. Oh, I understand bound. But I didn't understand what you said. And so I'd say the amount of evidence we have here is, I would say, if not on par with what the court affirmed in Murphy and Henderson. Sorry, if not above, then on par. And so in Murphy, you know, what we're talking about is two very quick drug sales. The quantity of drugs in Murphy, significantly lower. Maybe $100,000 worth of drugs. Here, $6 million worth of cocaine. We also have in Murphy, the guy actually lived at the house. We know he has a lawful purpose for being there. Here, you know, why would you pay for six months of rent when you're out of the country? And also in Murphy, you know. Did he have another home at this time in Denver or was this the only place? Not that I'm aware of. Well, you rent a house and you have a business where you have to leave six months. That's not. Sure. And that brings me to an interesting point that Murphy reminds us, that this is a totality of the circumstances analysis that is much like what we have in the probable cause context. And when we're doing the probable cause context, what we don't do is look at each piece of evidence in isolation and try and come up with these innocent alternative explanations. Because the defendant is very good at that. He says, you know, actually, like, maybe he was just doing this out of the kindness of his heart. Or like, you know, I think these text messages, you know, there's a different explanation for these things. But when you look at all of the pieces of evidence put together, what you have is direct admission from co-conspirator that they're using the house for this purpose. You have these two specific, serious drug transactions. You have the fact that the defendant has no reason for paying for this property other than to further his drug business. Excuse me, was there proof that he actually, he paid the $2,000 a month? Counsel said that there were money orders. They didn't know who paid it. So there's, so the loan was in his name. So presumably the person who the loan is in the name is responsible for payment. The defendant presented no evidence whatsoever that Mr. Laura Gallegos, the resident, you know, it's mentioned, it's asserted in one of her pleadings, but there's no record in the evidence. And that's something that the district court noted. And also I think it's important to note that the defendant's initial argument wasn't that Mr. Laura Gallegos was paying rent. It was that the defendant was actually just doing this out of the kindness of the heart because it was his uncle. So we also have this sort of inconsistent story that's not backed up by any facts in the record. And so, yes, the district court was in the difficult position of being limited to these stipulated facts. But I think when you have, you know, a loan in someone's name and he also had the closing documents for sort of leaving the house, I think the reasonable assumption there is that, and the utility bills also were in the record. So we know at the very least that he's paying for the utilities. So, I mean, just with Murphy, we're on that level of evidence, if not significantly above. And then in Henderson, you know, a similar situation, we have a guy who's dealing with much lower quantities of drugs, maybe like hundreds of dollars' worth of drugs. We have in that case three or four examples, but, again, they're not transactions like this one. They're really these little drug deals that happen at a guy's house. Again, it's actually his house. He lives there all the time. I just, it seems to me that the guideline is after kind of like drug houses, right, that destroy neighborhoods where you have a house and there's cocaine transactions happening all the time and neighbors hear cars coming and going at all hours of the night. To be sure, that's the primary purpose of the guideline, obviously. But it seems to me on the sliding scale, if we do consider severity or the scale of the transactions, even though they may be isolated, the nature of big transactions don't require the kind of going and coming. Right. Murphy talks about this reciprocal sliding scale where, you know, we're looking at frequency and quantity, and if one is high and one is low, they balance each other out. But, you know, I'd also remind the court that in Henderson, the court said that the purpose of this provision is to punish drug traffickers who use their property to run a drug business. If that's the purpose, it's hard to see how that's not met in this situation. Even if, yeah, he has this property for 18 months. Well, you have a doctor in the Hamptons who has a $5 million house, and he superficially leads a very normal life, runs to the beach, his kids go to the tennis courts, play at the club, just have themselves a jolly good time. But unbeknownst to anybody, the guy's a bad dude. And he also does one substantial transaction to keep the whole operation going that lasts six days. Can we say that that's a drug house? You know, and there's... That's the issue I'm asking about. I would say yes. You know, we colloquially refer to this as the stash house enhancement. That word never appears. I don't think you'd call that doctor's house a stash house, would you? No, no, certainly not. But I would say, I mean... I thought you would say yes, you would. If the transaction was, even though it was singular, it was... I think it qualifies for this provision, but I don't think... You know, when we think of a stash house, I don't think of some guy... But, you know, what's happening here, if, you know, we take that interpretation as, yeah, this guy has this $5 million house in the Hamptons, and he goes back to the city, but he's meanwhile running this drug business. And for the three months in the summer, in the winter, that he's not in his house in the Hamptons, he lets one of his underlings in his conspiracy receive drugs through that house. What he's doing is he's maintaining that house for the purpose of his drug trafficking business. I think that if that's what the purpose of the provision is, then it is very difficult to see how these, you know, obviously premeditated lengthy transactions don't qualify. And I just... In my 12 seconds, I will try and mention that Murphy talks about how, even outside of when the property is actually being used, it's still passively being used as a place that's always available to these drug traffickers. So we should consider those days, too. Thank you. I would ask you to affirm. Thank you. Thank you. Since I cut you off by one minute with my question, I'll make it two minutes. Thank you. Just to rebut a couple of the government's points. Number one, it's clear in Murphy over the fact that there were four specific times that they saw drugs coming in and out. They had information from the CI. In Henderson, also, there's a shorter period of time between December... I'm sorry, between February and April, where they see at least three separate buys. So you're talking about whether or not they happen for five minutes or they happen for a period of time, there's still constant flow. You've got 60 days and you've got at least four different transactions going on. I don't think that... I don't think the court can say, hey, because one was prolonged for six days versus another type of drug sale that happens much more constant than because ours was for a longer period of time, it should be considered a lot more important and this enhancement should apply versus one that happens much more quickly. The enhancement's purpose is to determine whether it's a primary use. And I agree, there could be more than one primary use of a home. But in this case, you have an incidental use. There's absolutely no cases in any court at all that have ruled that two incidences, whether they move eight kilos or they move ten kilos, is sufficient. And what is important is this entire... The judge keeps going back to the fact that this is a very big conspiracy, and I agree. But the indictment charges from the year before in 2013 all the way through 2016 when the individuals were arrested. So, yes, there were drug deals that were happening before. There were drug deals that were happening in Mississippi. There were drug deals that were happening in another house in Denver. There were drug deals happening in several different locations. But for this specific enhancement, they have to have occurred as the primary purpose of this house in Josephine. And that only includes two incidences. It doesn't include anything more. And that's an extension of what this enhancement applies to, regardless of what case you read. Also... Thank you, counsel. Okay. Do you have any other questions? No, thank you. Okay. Thank you very much. No further questions. Thank you, Romaine. You're excused. And the case is submitted. Interesting case. Thank you for your time.